824 A.2d 1017

**Anthony J. MILLER**

v.

**STATE of Maryland.**

**No. 652, Sept. Term, 2002.**

Court of Special Appeals of Maryland.

May 29, 2003.

236

238

Peter F. Rose, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for appellant.

Shannon E. Avery, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for appellee.

Argued before KRAUSER, BARBERA, and PAUL E. ALPERT (Retired, specially assigned).

KRAUSER, J.

Baltimore County police officers arrested appellant, Anthony J. Miller, in Baltimore City for a rape that occurred in Baltimore County. The legality of that extra-territorial arrest is the principal issue of this appeal. We are asked to determine whether, in crossing county boundaries, county police were out of bounds—or whether, as the State contends, they were merely out of time. In any event, they were not out of

luck: appellant was arrested in Baltimore City within a quarter mile of the crime scene and within an hour and a half of the crime.

Following his arrest, appellant was convicted in the Circuit Court for Baltimore County of first degree rape and was sentenced to life imprisonment. On appeal, he challenges the lawfulness of his arrest and the failure of the circuit court to suppress the evidence that flowed from it. Of lesser moment, he accuses the circuit court of admitting "prejudicial evidence of other crimes" and permitting the State to make improper remarks during closing argument.

For the reasons that follow, we shall hold, as the circuit court did, that appellant's arrest was lawful under the emergency provision of § 2–102 of the Maryland Criminal Procedure Article. But, even if it was not, we conclude that there are no statutory or constitutional grounds upon which to suppress the evidence seized. Finding no merit in any of the other issues raised by appellant, we shall affirm the judgment of the circuit court.

## Background

This case presents a farrago of facts. To avoid confusion, one should keep in mind that although appellant was, in this case, convicted of the rape of a college student, Rebecca D., on the campus of Towson University, he was not arrested until two and a half months after that attack and then it was not for the rape of Rebecca but of a twelve-year-old girl on a street in Baltimore County. Appellant's arrest for that crime occurred in Baltimore City within an hour and a half of that attack. It was the rape of the girl, not Rebecca, that resulted in the retrieval of appellant's DNA and his ultimate identification as Rebecca's assailant.

We begin our review of the events leading up to appellant's arrest by recounting the circumstances surrounding the first of the two assaults, the attack on Rebecca. On March 25, 2001, at 12:25 a.m., Rebecca was walking home after working late at a restaurant. As she walked through the campus of

Towson University to her apartment building, she noticed a man walking behind her. Minutes later, he grabbed her from behind and threatened to kill her if she screamed. He insisted that he had a needle with HIV in it. Rebecca believed he was armed with at least a knife.

The man then wrestled Rebecca to the ground and raped her. Choking her, he told her that if she did not stop screaming, he would kill her. He then dumped the contents of her purse, took her wallet, and fled in a "boxy, gold-colored sedan." After he left, Rebecca ran to her apartment, a short distance away. When she got there, her roommate called the police. Officer Cathleen Dover of the Baltimore County Police Department responded to the call.

During her interview with the officer, Rebecca described her attacker as a dark-complected, black male, with a shaved-head,[1] approximately thirty years old, five foot nine inches tall, two hundred pounds, and a "heavy build." Later, at the Greater Baltimore Medical Center, Rebecca underwent a physical examination. There, a sample of her blood was taken, and vaginal swabs collected. The next day, on March 26, 2001, Rebecca met with a police sketch artist, and he drew, with her assistance, a sketch of her assailant.

Two and a half months later, on June 7, 2001, a twelve-year-old girl was raped in Baltimore County. Her attacker was described as a black male, clean cut and sporting a mustache, wearing a white shirt and black pants, and driving a maroon Mercury with license plate number HHE917. With that information, Baltimore County police arrested appellant, who matched that description, an hour and a half later in Baltimore City.

The photograph taken of appellant following his arrest was later shown to the minor victim as part of a photo array. From that array, she was able to identify appellant as her

---

1. Rebecca initially described her attacker as bald, but later, when questioned by a police officer, she clarified that he had a shaved head "but he wasn't completely bald."

attacker. As a result of that identification, the police were able to obtain a search warrant authorizing them to obtain a penile swab and to collect a sample of appellant's blood from which they extracted his DNA. When it is was found that his DNA matched the DNA of Rebecca's assailant, appellant was charged with that offense as well.

### Suppression Hearing

Before trial, appellant moved to suppress "all testimony regarding DNA testing and results." At the suppression hearing, Detective Wayne Jedlowski of the Baltimore County Police testified that, on June 7, 2001, Lieutenant Garleska, his supervisor, received information that a twelve-year-old girl was raped at 4:16 p.m. that day on York Road in Baltimore County by a "clean cut" black male with a mustache, wearing black pants and a white shirt. The detective was also given the license plate number and a description of the vehicle in which the suspect fled the scene of the crime.

The vehicle was described as a maroon Mercury with a Maryland license plate number HHE917. A motor vehicle records check revealed that the vehicle was registered to Venous Charlotte Marie Johnson, a twenty-year-old woman, living at 346 East Belvedere Avenue in Baltimore City, about a quarter mile away. At 5:00 p.m., approximately forty-five minutes after the rape occurred, the lieutenant requested that Detective Jedlowski and his partner, Detective Aiosa, conduct a surveillance at the East Belvedere Avenue address to determine whether "the suspect vehicle was there and [to] wait at th[at] location" to see if the vehicle would show up. The detectives then drove to that address in an unmarked car, but displayed badges around their necks that identified them as police officers.

The detectives arrived at the East Belvedere Avenue address at 5:15 p.m. Fifteen minutes later, at 5:30 p.m., Detective Aiosa saw a maroon Mercury with the license plate number HHE917 approaching. As the vehicle passed the detectives, the officers observed a clean-cut black male driver, with short hair, wearing a white dress shirt, and a female

passenger in the front seat. The vehicle passed them, and the detectives followed. They lost sight of the vehicle but, within seconds, observed the vehicle in a parking lot, its two occupants looking at the officers. When the detectives drove into the lot, the Mercury pulled out of the parking lot and then drove into an alley behind a group of row houses, one of which bore the address of the Mercury's owner, Venous Johnson.

At that point the detectives called the dispatcher for the Baltimore City Police Department and requested backup. As the vehicle traveled down the alley, the officers followed at a distance of about "a foot or two," holding their police badges up and motioning to the driver to pull over. He did not. Ignoring their request, the driver of the Mercury, with the detectives trailing behind, proceeded to do another loop around the block. Throughout the pursuit of the Mercury, the detectives continued to update the dispatcher, hoping that a Baltimore City or a Baltimore County police car would respond.

Detective Jedlowski testified that, at one point, the Mercury came to a complete stop and the driver's side door opened. The detectives were about to exit their vehicle when the Mercury's door shut and it continued down the road. When a marked Baltimore County police car arrived, the detectives radioed the squad car to get behind the Mercury. It did, and with its emergency equipment activated, it began to follow the Mercury. Eventually, the Mercury stopped at an intersection because of oncoming traffic. The detectives took that opportunity to block the suspect's Mercury with their vehicle and arrested appellant.

A photograph was taken of appellant following his arrest, which was later placed in a photo array. That array was shown to the twelve-year-old rape victim, who thereupon identified appellant, from his photograph, as her attacker. As a result of that identification, the State obtained a search warrant authorizing it to perform a penile swab and collect a sample of appellant's blood to obtain his DNA.

Denying appellant's motion to suppress, the circuit court first found that County police had probable cause to arrest appellant. The court observed that, at the time of his arrest, appellant was driving the car identified as having been used by the suspected rapist to flee the crime scene only an hour and a half earlier; that he matched the description of the suspect; and that he had taken evasive action when police attempted to stop his vehicle. It further found that County police had authority to make the arrest within the City boundaries under § 2–102 of the Maryland Criminal Procedure Article, as they were confronted by an emergency when they came upon a man matching the description of a rapist and driving a car identical to the one driven by the rapist as he fled the scene. The court pointed out that the detectives did not know the status of the woman who was in the car with appellant and stressed that a rapist on the loose posed a danger to society at large. It concluded "that even absent the probable cause and absent the statutory authority, case law would [have] still permit[ted] the use of [appellant's] photograph" to obtain a search warrant to collect a sample of appellant's DNA.

## I.

Appellant contends that the trial court erred in failing to grant his motion to suppress the fruits of the arrest, specifically his photograph and his DNA. He argues that the Baltimore County police had no legal authority to arrest him in Baltimore City, as the police were not engaging in fresh pursuit of a suspected felon, under § 2–301 of the Maryland Criminal Procedure Article, at the time of his arrest. That section provides that a "law enforcement officer may engage in fresh pursuit of a person who ... has committed or is reasonably believed by the law enforcement officer to have committed a felony in the jurisdiction in which the law enforcement officer has the power of arrest." Md.Code (2001, 2002 Supp.) § 2–301(c)(1) of the Crim. Pro. Art. Therefore, according to appellant, his "arrest was illegal and any fruits of that illegal arrest should have been suppressed as the 'fruit of the poison[ous]

tree' " under *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

In making that argument, appellant erects a "straw man:" That is to say, he misrepresents the circuit court's holding and then confutes it. "Fresh pursuit" was not the basis of the circuit court's decision. In fact, neither fresh pursuit nor the statute authorizing it, § 2–301(c)(1), was even mentioned by the circuit court in denying appellant's motion to suppress. It upheld appellant's arrest based on an entirely different provision of Maryland law: § 2–102 of the Maryland Criminal Procedure Article.

That section provides, in part, that "a police officer may make arrests, conduct investigations, and otherwise enforce the laws of the State . . . without limitations as to jurisdiction" when:

 (i) 1. the police officer is participating in a joint investigation with officials from another State, federal, or local law enforcement unit, at least one of which has local jurisdiction;

 2. the police officer is rendering assistance to another police officer;

 3. the police officer is acting at the request of a police officer or State Police officer; or

 4. **an emergency exists;** and

 (ii) the police officer is acting in accordance with regulations adopted by the police officer's employing unit to carry out this section.[2]

Md.Code (2001, 2002 Supp.) § 2–102(b)(3) of the Crim. Pro. Art. (emphasis added).

An "emergency" is defined in § 2–101(b) as "a sudden or unexpected happening or an unforeseen combination of circumstances that calls for immediate action to protect the

---

2. There is apparently no dispute that the police were "acting in accordance with regulations adopted by" their "employing unit," as this issue was never raised by either party.

health, safety, welfare, or property of a person from actual or threatened harm or from an unlawful act." Md.Code (2001, 2002 Supp.) § 2–101(b) of the Crim. Pro. Art. The circuit court found, and we agree, that an "emergency" justified appellant's arrest.

County police received information that a twelve-year-old girl had been raped on York Road in Baltimore County at approximately 4:16 p.m. that day. They received a detailed description of the purported rapist and a description of the car in which he had been seen leaving the scene of the crime. It was a maroon Mercury with license plate number HHE917. A vehicle registration records check revealed that the car was registered to Venous Charlotte Marie Johnson at 346 East Belvedere Avenue in Baltimore City. That address is only a quarter mile from where the rape occurred.

At 5:00 p.m., only forty-four minutes after the attack, the detectives went to Ms. Johnson's residence, as instructed by their superior, to determine whether "the suspect vehicle was there and [to] wait at the location" to see if the vehicle would show up. Fifteen minutes later, at 5:15 p.m. the detectives arrived at East Belvedere Avenue, and, about fifteen minutes after that, they saw a maroon Mercury with the license plate number HHE917 approaching. The detectives observed that the male driver was wearing a white dress shirt and had short, clean cut hair, which fit the description of the rapist. They also noticed that a female was in the passenger seat next to him.

The detectives had reason to believe, as the circuit court found, that an emergency situation existed. The registration address of the vehicle appellant was seen driving, as he left the scene of the crime, was for an address only a quarter mile away.

The detectives therefore had reason to believe that a dangerous and violent felon, who had just raped a twelve-year-old girl, might be only a short distance from where they were. Moreover, the vehicle was registered, not to a male, but to a female, which of course raised questions as to her safety.

Attempting to intercept a malefactor, the officers drove over to the registration address. Shortly after they arrived at that address, they spotted the suspect vehicle and the man driving the vehicle fit the description of the rapist. Inside the car was an unknown female, who may or may not have then been in danger. Under these circumstances, it was imperative to act quickly to protect the public, and possibly the female passenger, from a violent sexual predator. As this Court observed in *Swain v. State*, 50 Md.App. 29, 41, 435 A.2d 805 (1981), "[t]he greater the danger to the public safety, the more important it is to apprehend the suspect quickly."

Not only did appellant fit the description of the twelve-year-old girl's assailant, but he was driving a vehicle that matched the description of her attacker's car down to its license plate number. Disregarding every effort by the detectives to induce him to pull over, appellant stopped only when the officers blocked his path. The decision of the detectives to make an extra-territorial arrest of appellant was justified by the pressing urgency of the situation. The circumstances of that apprehension constituted an emergency under § 2–101 and thus the detectives had the necessary statutory authority to investigate and arrest appellant in Baltimore City.

■ But even if the officers did not have authority under § 2–102 of the Maryland Criminal Procedure Article to arrest appellant, the court had no legal basis upon which to suppress the evidence obtained from that arrest. Maryland does not have an independent exclusionary rule, *Howell v. State*, 60 Md.App. 463, 466, 483 A.2d 780 (1984), nor does § 2–102 create one.

■ That section does not require the suppression of any evidence obtained in violation of it. And we cannot supply what the legislature has omitted, without, in the words of Justice Felix Frankfurter, "add[ing] a colonial wing to a gothic cathedral." *Interstate Commerce Comm'n v. J–T Transp. Co.*, 368 U.S. 81, 115, 82 S.Ct. 216, 7 L.Ed.2d 147 (1961)(dissenting opinion). Indeed, § 2–102 was intended not to control or limit police activity, but to enhance and expand it. Its purpose, as

stated in the legislative summary of its senate progenitor, was to "foster greater efficiency and cooperation among law enforcement officers in fighting crime on a multi-jurisdictional level." *Limited Extrajurisdictional Authority for Police Officers,* 1993 Leg. (Md.1993)(summary of S.B. 344). We therefore conclude that § 2–102 does not require, by either its terms or its history, the suppression of evidence as a sanction for the failure to comply with its provisions.

■ Nor is there any constitutional basis for suppressing appellant's photograph and DNA, as there is no constitutional right at issue here. It hardly needs to be stated that appellant has no constitutional right to be arrested by the police of a particular jurisdiction.

■ And finally, even if County police had unlawfully arrested appellant, the Fourth Amendment does not necessarily require the suppression of any and all evidence seized pursuant to that arrest, as fruit of the poisonous tree. Not all evidence, the Supreme Court has observed, is " 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police." *Wong Sun v. United States,* 371 U.S. at 488, 83 S.Ct. 407. The appropriate question, the Court instructed, is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id.* at 487–88, 83 S.Ct. 407 (citation and internal quotation omitted). Indeed, where "the connection between the lawless conduct of the police and the discovery of the challenged evidence" is so attenuated as to dissipate the taint, such evidence is admissible. *Id.* at 487, 83 S.Ct. 407. *See also Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939).

Citing that language, this Court held, in *Robinson v. State,* 53 Md.App. 297, 452 A.2d 1291 (1982), that a routine booking photograph could be used to identify Robinson both in and out of court, even though it had been taken as a result of an unlawful arrest for another offense. In other words, the con-

nection between that photographic event and the unrelated charges for which Robinson now stood accused was so attenuated that it rendered the photographic evidence untainted by whatever illegality may have previously occurred.

In *Robinson*, two men robbed an automotive moving center and two of its employees on April 18, 1981. *Id.* at 298, 452 A.2d 1291. Two weeks later, on May 5, 1981, Robinson was arrested in connection with another criminal offense and his photograph was subsequently taken pursuant to that arrest. *Id.* One month later, that photograph was shown, as part of a photo array, to the two employees of the April robbery. *Id.* One of them was consequently able to identify Robinson as the robber, and Robinson was arrested. *Id.*

Prior to trial, Robinson moved to suppress the photograph taken from the May 5th arrest on the ground that he was illegally arrested, and, as a consequence, the photograph was the tainted fruit of that arrest. *Robinson*, at 307, 452 A.2d 1291. The circuit court disagreed. It prohibited Robinson from inquiring into the circumstances of the May 5th arrest to determine its legality and then denied his motion to suppress. *Id.*

Following his conviction for robbery, Robinson noted an appeal, arguing that he was entitled to inquire into the validity of the May 5th arrest at the suppression hearing. *Robinson*, at 308, 452 A.2d 1291. He reasoned that, "if [the May 5th] arrest was unlawful, the photograph taken of him would be subject to suppression as tainted fruit from a poisonous tree." *Id.*

Affirming the denial of Robinson's motion, Judge Wilner, speaking for this Court, stated that "[w]hether appellant's warrantless arrest on May 5 was legal or illegal, it had absolutely nothing whatever to do with [the pending] case." *Robinson*, at 310, 452 A.2d 1291. There was no evidence, or even a suggestion, we pointed out, that Robinson had been "arrested (or photographed) as a pretext for gathering evidence" for that case. *Id.* Quoting *People v. McInnis*, 6 Cal.3d 821, 100 Cal.Rptr. 618, 494 P.2d 690 (1972), we explained that

if a court were "[t]o hold that all such pictures resulting from illegal arrests are inadmissible forever because they are 'fruits of the poisonous tree'" it "would in effect be giving a crime insurance policy in perpetuity to all persons once illegally arrested." *Robinson*, at 311, 452 A.2d 1291 (internal quotations omitted)(quoting *McInnis*, 100 Cal.Rptr. 618, 494 P.2d at 693).

Although, as *McInnis* pointed out, "it could be urged that *but for* the old illegal arrest the criminal would not have been identified," we agreed with the conclusion of the *McInnis* court that this "but for" relationship is "insufficient" to render such a photograph inadmissible, since its subsequent use in the prosecution of an entirely different offense did not constitute an exploitation of the original illegal arrest. *Robinson*, at 311, 452 A.2d 1291 (internal quotations omitted)(quoting *McInnis*, 100 Cal.Rptr. 618, 494 P.2d at 693).

We concluded, in *Robinson*, that, in order to suppress a routine booking photograph taken as a consequence of an illegal arrest, Robinson must present "evidence (or a reasonably firm and detailed proffer of evidence) tending to show that appellant's May 5 arrest was not only illegal but was merely a pretext for a general exploratory search ... or for gathering evidence in [the pending] case." *Robinson*, at 312, 452 A.2d 1291. Accordingly, we held that "the legality or illegality of the May 5 arrest, standing alone, was quite irrelevant to the suppression issue," and the court did not err in foreclosing an inquiry into it. *Id.* at 312–13, 452 A.2d 1291.

In this case, appellant was arrested for the rape of a twelve-year-old girl on June 7th, the very day that the rape occurred. A photograph was taken of appellant, as part of the booking process, and that photograph was later shown to the minor victim as part of a photo array. She was able to identify appellant as her attacker and, as a result of that identification, the police were able to obtain a search warrant, authorizing them to obtain a penile swab and to extract a sample of appellant's blood for the purpose of procuring appellant's

DNA. The DNA collected from appellant matched the DNA found on Rebecca's vaginal swabs.

This case presents facts that in all material respects are the same as those presented by the *Robinson* case: Appellant was identified as a result of a routine booking photograph taken of him in a different case; appellant challenged the admissibility of that photograph on the ground that it was a consequence of an illegal arrest; and appellant never claimed that his arrest was "merely a pretext for a general exploratory search . . . or for gathering evidence in [the pending] case." Consequently, as in *Robinson,* the photograph taken of appellant was not tainted by either the unrelated arrest or by any "exploitation" of that arrest. *Robinson,* at 311–12, 452 A.2d 1291 (internal quotations omitted)(quoting *McInnis,* 100 Cal.Rptr. 618, 494 P.2d at 693). Therefore, consistent with that case, we shall affirm the circuit court's denial of appellant's motion to suppress any evidence that flowed from the arrest at issue, including appellant's DNA. Indeed, if the photograph was admissible evidence—and we have held that it was on three separate grounds—it could hardly be argued that it did not provide a lawful basis for the search warrant to procure appellant's DNA, which followed.

## II.

■ Appellant contends that the trial court erred in permitting the State, on rebuttal, to "comment on the non-production of witnesses by the defense," which, according to appellant, "amount[ed] to an improper shift in the burden of proof to the defendant." It then compounded its initial error, appellant claims, by denying his request for a curative instruction.

■ Preliminarily, we note that " 'closing argument is a robust forensic forum wherein its practitioners are afforded a wide range for expression.' " *Clarke v. State,* 97 Md.App. 425, 431, 630 A.2d 252 (1993) (quoting *Davis v. State,* 93 Md.App. 89, 124, 611 A.2d 1008 (1992), *aff'd,* 333 Md. 27, 633 A.2d 867 (1993)). "There are no hard-and-fast limitations within which the argument of earnest counsel must be confined—no well-

defined bounds beyond which the eloquence of an advocate shall not soar. . . . He may indulge in oratorical conceit or flourish and in illustrations and metaphorical allusions." *Wilhelm v. State,* 272 Md. 404, 413, 326 A.2d 707 (1974). Indeed, very few convictions would stand, as the Court of Appeals observed, if every remark made by counsel in the heat of argument, though untethered to the evidence, was ground for reversal. *Id.* at 414, 326 A.2d 707.

■ But the boundaries of appropriate argument are not limitless. *Wilson v. State,* 148 Md.App. 601, 654, 814 A.2d 1 (2002). Determining when those boundaries have been crossed is the task of the trial judge. And that determination shall stand on appeal unless, in making that determination, "there has been an *abuse of discretion* by the trial judge of a character likely to have injured the complaining party." *Wilhelm,* 272 Md. at 413, 326 A.2d 707.

In closing argument, defense counsel challenged the strength of the State's case by calling into question the State's contentions that the assault at issue constituted first degree rape; that the DNA identification of appellant was reliable; and that the cuts and abrasions to the victim's vaginal area were consistent with rape. Defense counsel stated, in part:

> Now, the statement about the needle full of HIV, she remembered that being said but she couldn't really recall whether she believed it at the time because in retrospect it seemed, I think her exact word was silly, because it was not a credible threat at the time. She never saw a needle, he never produced a needle.
>
> * * *
>
> She said his hand was around her neck, and the elements of first degree rape, particularly one that involves strangulation, that you have to consider, disfigurement or other serious injury, doesn't say choking because choking is a very broad term that we use when we cough. It can mean just having a slight obstruction of the throat. . . .
>
> She testified that she spoke to her attacker. She said things to him, why are you doing this, you know, can you do

something else instead of this? Can I have my things back? Obviously she was breathing. There's no evidence that she had been forced—the air had been stopped completely, and there is no evidence at all that whatever the injuries that occurred to her neck, if, in fact, that's what they were, were caused by the attack because nobody asked her did you have those red marks before. . . .

\*　　\*　　\*

She testified, that's Rebecca, testified that she believed he ejaculated and she believed that can cause, a logical reason, which is the intercourse stopped. There was no body fluid found at the scene. There was no, no evidence about any bloody [sic body] fluids anywhere else except her body, which is where they got the vaginal swabs.

\*　　\*　　\*

[The sexual assault forensic examiner] came, she got on the stand and she said that there was multiple abrasions, tears and cuts in the area of the vagina, the genital area of [Rebecca] without any qualification as to what that means, and for people that have never been a [sexual assault forensic examiner] or never been a trial attorney or never, for whatever reason have never been exposed to that kind of stuff, that may sound like there was this severe injury existed in that area. In other words, severe injury that may not be curable or may lead to permanent disfigurement or impairment. I spent probably more time than I should have arguing with the witness about other potential ways to get those injuries because—and also to show that they're not even visible by the naked eye for the most part. What she saw was redness and swelling and she said I think my recollection is two injuries were visible to her naked eye and they were literally, you know, very minor abrasions.

Now, I'm not saying that because I'm trying to minimize the trauma of rape. That's not at all what that, what that evidence or what I was trying to get as evidence had to do with. It had to do with whether or not that would meet the criteria for serious physical injury as it pertains to first

degree rape. And I had a hard time getting it because I think I did, which is that there are other causes for it. She did not rule them out.

She didn't even ask any questions about the possibility, and there was reason to believe that there may have been other objects or whatever that may have come into contact, and what I mean is the fact that [Rebecca] had been menstruating recently.

* * *

In terms of the DNA, I know that to hear something is a one in a 5.8 quadrillion chance or a one quad—quintillion chance, as the case may be, is almost inconceivable. It sounds like absolute proof. However, she said herself that the way that they get those statistics is by a sample of two hundred people from each population.

* * *

All right, when you take two hundred people who are reporting that they are African/American and two hundred people that are reporting they're Caucasian and then making extrapolations from those populations you are already corrupting science because you are already accepting a subjective view of one's identity. The fact is most of us don't even really know who has been in our family a couple of generations back. Beyond that, there's the problem that there's been absolutely no collection systematically and extrapolation of statistics of any other ethnic group.

In response to those remarks, the prosecutor stated, in rebuttal:

Ladies and gentlemen, when you come into a courtroom, it's about evidence. It's not about smoke and mirrors. It's about evidence and what you saw in this courtroom, what you heard. On the one hand, you are being told I'm not challenging the rape, yet you heard at length cross examination of [the sexual assault forensic examiner] about tampons, aggressive sex, douching causing injury to a vagina. That would be an explanation, not rape, to explain why those injuries were on Rebecca.

You know what, what would have been evidence, ask Rebecca. Do you recall, were you using tampons? That was specifically not done because it's not a question of evidence. It's a question of clouding your judgment, diverting you from the, from the evidence in this case.

No ejaculate at the scene. My God, it was found in her vagina. What conceivable, conceivable reason could that be brought up but to cloud your judgment, divert you from the evidence. Smoke and mirrors.

The action of choking isn't strangulation. Ladies and gentlemen, the law doesn't require you to die for rape. If you are threatened with death, that is sufficient for a first degree rape.

The DNA evidence in this case had been uncontradicted. It's been suggested there is something wrong with the statistics. Two hundred isn't enough pool. Well, let's go back to the evidence. If there was evidence that there was a problem with the statistics you would have heard it. If there was evidence that there was a problem with the DNA test performed in this case, you would have heard it. There is no evidence. It's smoke and mirrors to divert you from the only conclusion that you can reach. Fourteen points, excuse me, it's thirteen, thirteen points matched the Defendant at each and every location.

There is absolutely no contact between this victim and that Defendant except for one night on a rape. That is the only way his DNA can get in her body. The statistical probability is overwhelming. It is beyond the population of the world. It is a match. It was him. Find him guilty.

After the State's rebuttal, defense counsel asked permission to approach the bench. Permission was granted and the court and counsel engaged in the following exchange:

[DEFENSE COUNSEL]: ... I didn't object during her rebuttal argument about, you know, there's no evidence produced that there was a problem with the DNA or separate test and things. I think that leads to the

inference that I had a duty to put on that evidence or I had a burden to show—

THE COURT: Your problem was you had nothing to work with, and you tried to work with nothing and she [the prosecutor] pointed it out. It's that simple.

[DEFENSE COUNSEL]: Don't you think that would lead to an inference that I should have produced more evidence?

THE COURT: No. I'll tell you what I'll do, when they're gone, I'll tell you, you did a good job with nothing, so when you get post convicted they will be able to see.

[DEFENSE COUNSEL]: You're not telling them that before verdict?

THE COURT: No. You did. This is a very difficult case for you and the evidence is pretty clear that Ms. Coffin just said his sperm was in her body, how did it get there. You know, when you distill this case to its common denominator, that's it. So—

[DEFENSE COUNSEL]: I was probably—I was just asking whether or not you thought a curative instruction about the Defendant didn't have a duty to produce more evidence. I mean, they can still make whatever inferences they are entitled to.

THE COURT: No. You can object to me not doing it, but I'm not.

[DEFENSE COUNSEL]: I just want to put the request on the record. That's all. Thanks.

In *Wilson v. State*, 148 Md.App. 601, 814 A.2d 1 (2002), we considered whether the prosecution's closing remarks concerning the defense's non-production of witnesses and evidence were improper and merited a mistrial. There, the prosecutor stated:

Now, you heard from the judge's instructions that the [defendants are] claiming that Alvin Thomas was involved in this somehow, that he was part and parcel of it, that he got together with [defendants] and said, "Hey, let's go over to the house and rob my relatives and kick the door in."

That's what they're saying. Did you hear that from any of these witnesses? No. Did you hear that in any of the statements that were made by [defendants] to any of these witnesses? No. Do you see that reflected in any of the writings that came into evidence from Fish [McCoy]? No. Why not? Because we're at trial and [defendants have] to do something.

*Id.* at 652, 814 A.2d 1. Objecting to these comments, defense counsel argued that they shifted the burden of proof to the defendants. "We don't have any obligation to produce anyone," defense counsel declared. *Id.* Nonetheless, that objection was overruled. *Id.*

During rebuttal, the prosecutor then stated:

Ronald McNeil, folks. Here he is. Do you think [defendants] really wanted to hear from Ronald McNeil? This way they get to say, well, you know, all these wonderful nasty things about Mr. McNeil without Mr. McNeil ever being here. So here he is. He's right here.

[Defendants] said we could have called McNeil, we could have called Collins, we could have called Tweaky Milspaw, we could have called Judy Berlin—another week of trial. [Defendants] probably could have called Lisa Miles (phonetic) and Lisa Miles'[s] whole family to put them on at least on Fish's [McCoy] case—

*Wilson,* at 653, 814 A.2d 1. Defense counsel objected again and that objection was also overruled. *Id.*

On appeal, the defendants renewed their argument that the prosecutor's comments shifted the burden of production of evidence from the State to the defense. *Wilson,* at 654, 814 A.2d 1. We disagreed and held that "the State's closing argument did not shift the burden of persuasion" to the defendants, pointing out that "[t]he case was not a close one and the evidence weighed heavily in the State's favor;" that the witness, upon whose failure to testify the State commented, "was not central to the case;" and that the State's rebuttal comments were "merely in response to [defendants']

closing arguments" and were therefore proper. *Id.* at 655, 814 A.2d 1.

As in *Wilson*, here, the State's rebuttal argument did not impermissibly shift the burden of production of evidence to the defense. It was only responding to issues raised by defense counsel in closing argument. *See Degren v. State*, 352 Md. 400, 431, 722 A.2d 887 (1999)("This Court has held that, under certain circumstances, a prosecutor's argument during rebuttal and in response to comments made by the defense during its closing are proper."); *Booze v. State*, 111 Md.App. 208, 224, 681 A.2d 534 (1996)(holding that defense counsel "opened the door" to the State's rebuttal remarks when defense counsel raised the issue in his closing argument); *Blackwell v. State*, 278 Md. 466, 481, 365 A.2d 545 (1976)(holding that the prosecutor was entitled to respond to defense counsel's remarks about celebrated criminals that received life sentences, rather than the death penalty).

Moreover, like *Wilson*, this was not a close case. The State presented overwhelming evidence that appellant had committed the rape. He fit the description of the assailant and the composite sketch prepared by a police sketch artist with the victim's assistance. Even more important, the DNA evidence taken from the victim's vaginal swabs confirmed his identification. In the words of the trial court, defense counsel "did a good job with nothing." Nor do we believe, given the broad discretion afforded trial courts in making such determinations, that the trial court abused its discretion in denying petitioner's request for a curative instruction, as none was necessary.

### III.

Appellant contends that the trial court erred when it permitted Detective Robert Caskey, who obtained blood samples from appellant pursuant to a search warrant, to testify that he was presently working with the "child sex abuse division" and further erred by denying appellant's request for a curative

instruction. The "resulting prejudice," appellant claims, "was sufficiently serious to justify the granting of a mistrial."

At issue here is the following testimony:

(THE CLERK): For the record, state your full name and spell your last name.

[DETECTIVE CASKEY]: Detective Robert Caskey, C–A–S–K–E–Y.

[THE STATE]: Your current position?

[DETECTIVE CASKEY]: Child sex abuse division.

[THE STATE]: For Baltimore County Police?

[DETECTIVE CASKEY]: Yes, I'm sorry.

The trial court then asked counsel to approach the bench and the following exchange occurred:

[DEFENSE COUNSEL]: I know that the State has made no mention of the other case, but I would be asking for a curative instruction about the child sex abuse.

THE COURT: Did you talk to him about that?

[THE STATE]: Gosh, yes, sir. At length.

[DEFENSE COUNSEL]: It's just it's the child sex abuse division.

THE COURT: I know.

[DEFENSE COUNSEL]: And I would just like a curative instruction.

THE COURT: But the other case, I mean, he's not going to go into that.

[THE STATE]: He gets the first blood sample as a result of this case. My question to him is: I direct your attention to June 8th. Did there come a time when you obtained a search-and-seizure warrant and obtained blood? No, nothing about why. Then she questions him. That's it. Oh, and identify the Defendant.

[DEFENSE COUNSEL]: I am concerned about her questioning, that she be very careful about that. I am concerned about the influence that creates when he says "child sex abuse".

THE COURT: There's nothing I can do about that. That's where he's from.

[THE STATE]: I don't care if you give an instruction. But it seems to me it would draw more attention. You don't want that, you really don't. Let's leave that alone.

[DEFENSE COUNSEL]: All right then.

THE COURT: The thing for you to do is get him out of here.

[THE STATE]: Right.

[DEFENSE COUNSEL]: Thanks.

 Although appellant's counsel requested a curative instruction, when that request was denied, she did not request a mistrial. Consequently, her claim that the trial court should have granted her a mistrial was not preserved for appellate review. Preservation of an issue for appellate review is governed by Maryland Rule 8–131(a), which states in pertinent part: "Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court. . . ." *See Bates v. State,* 127 Md.App. 678, 736 A.2d 407 (1999).

 Even if this issue had been preserved, it is without merit. Specifically, appellant claims that Detective Caskey's testimony that he was presently working in the child sex abuse division amounted to "other crimes" evidence implicating appellant in other sexual crimes and that the trial court therefore erred in denying his request for a curative instruction.

> Maryland Rule 5–404(b) defines "other crimes" evidence as: Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity, or absence of mistake or accident.

In other words, "[e]vidence of prior criminal acts may not be introduced to prove guilt of the offense for which the defen-

dant is on trial." *Terry v. State,* 332 Md. 329, 334, 631 A.2d 424 (1993); *see also Behrel v. State,* 151 Md.App. 64, 823 A.2d 696, 2003 Md.App. LEXIS 60.

In this case, Detective Caskey was testifying as to his present employment, more than two years after the rape at issue. This employment information was not intended to suggest that appellant was involved in any other sex crimes. Nor did it. Indeed, the State never argued or even suggested, either expressly or impliedly, that appellant was involved in other sex crimes or was prone to commit such offenses. Detective Caskey's identification of his employment position simply does not constitute evidence of a criminal propensity.

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**

PAUL E. ALPERT, Judge, concurring.

I concur in the result only.