837 A.2d 956

**Keith Alexander BROWN**

v.

**STATE of Maryland.**

**No. 617, Sept. Term, 2002.**

Court of Special Appeals of Maryland.

Dec. 8, 2003.

548

Laurel A. Albin (Byron L. Warnken, Law Offices of Bonnie L. Warnken, LLC, on the brief), Baltimore, for appellant.

Diane E. Keller (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellee.

Argued before SALMON, JAMES R. EYLER, and KRAUSER, JJ.

## ON MOTION FOR RECONSIDERATION

SALMON, Judge.

In *Brown v. State,* 359 Md. 180, 753 A.2d 84 (2000), the convictions of appellant, Keith Alexander Brown, for first degree murder and use of a handgun in the commission of a felony were vacated and the case was remanded for a new trial. The second trial lasted sixteen days. The State called thirty witnesses, and the defense called seven. After the re-

trial, appellant was convicted of second degree murder and use of a handgun in the commission of a felony.

With exceptions that will be discussed *infra*, the evidence introduced at the second trial was similar to that at the first. The Court of Appeals, in *Brown v. State*, accurately summarized that evidence as follows:

Makea Stewart was found dead around 3:30 a.m. on September 10, 1995 in an alleyway behind 3326 Gwynns Falls Parkway, in Baltimore City. She had been shot eight times with a .380 caliber handgun that was owned by petitioner and was later recovered from his car. Petitioner's fingerprints were found on the magazine of the weapon. A witness, Jerry Manns, reported hearing gunshots from his kitchen window at approximately the time of Ms. Stewart's reported death. From his window, he saw an African–American male in his twenties leave the alley and drive off in a small two-door car with a malfunctioning muffler. He saw the same man return a short time later with a gun in his hand. Manns heard a single gunshot and then saw the man get back into his car and leave. It was later established that petitioner, an African–American male, drove a two-door Mazda with a faulty muffler. Near Ms. Stewart's body Detective Barlow discovered her pager, which showed that several calls had been made to the pager from a cellular phone later found in petitioner's possession.

Ms. Stewart's mother, Jill Sullivan, informed Detective Barlow that Ms. Stewart had been having an affair with a married man named Keith, that her daughter told her two days before the murder that she (Ms. Stewart) was pregnant with Keith's baby and that she was going to confront Keith about the pregnancy. A friend of Ms. Stewart, Cassandra Green, testified at trial that she overheard Ms. Stewart telling petitioner that she might be pregnant and that petitioner told the victim that he knew she was pregnant and that she had a decision to make. Genetic tests confirmed that, at the time of her death, Ms. Stewart was pregnant with petitioner's child.

The State's theory was that petitioner, from the very inception of his marriage to Ms. Brown, was romantically involved with Ms. Stewart, that Ms. Stewart became pregnant as a result of the affair, that petitioner insisted that she abort the pregnancy, that she refused, and that he killed her because he feared that the pregnancy would wreck his marriage. Petitioner made clear, both at the outset and throughout the trial, that his defense was based on the proposition that his wife, who was aware of his affair with the victim and had threatened both him and the victim in the past, killed the victim out of jealousy. He asserted that position to the court in arguing a pre-trial motion, he asserted it to the jury in his opening statement, he implied it in his own testimony and in the cross-examination of some of the State's witnesses, and he again asserted it more directly in closing argument.

\* \* \*

Ms. Brown [appellant's wife] then testified that on September 9, 1995—the night of the murder—petitioner returned home at around 4:00 a.m., that she asked him where he had been and that he refused to tell her. Ms. Brown then got into an argument with petitioner about his talking with the victim. In response to the question, "What happened then," Ms. Brown said, apparently to everyone's surprise, "He told me he killed her and I didn't believe him."

\* \* \*

Ms. Brown recounted two additional conversations. Later that evening, they learned from television news that two bodies had been found, "and I asked if one of them was her and he said yes...."

*Id.* at 183–86, 753 A.2d 84.

The Court of Appeals reversed appellant's convictions in *Brown, supra,* because the trial court erred in admitting into evidence appellant's wife's testimony that he had confessed to

her that he had killed the victim. The Court of Appeals ruled that appellant's (alleged) communication to his wife was protected, and thus inadmissible, pursuant to the privilege set forth in section 9–105 of the Courts and Judicial Proceedings Article of the Maryland Code (1973, 2002 Repl.Vol.). The mandate of the Court of Appeals was issued on July 10, 2000.

The three major differences between the evidence introduced in the first and second trials were: (1) in the second trial, appellant's wife did not testify concerning statements about the murder made to her by appellant; (2) appellant's videotape testimony from the first trial was introduced by the State at the second trial, but appellant did not take the stand in his own defense during that trial; and (3) the bullets and the bullet casings found at the scene and the gun owned by appellant were not available to be introduced into evidence at the second trial. Despite those differences, appellant's defense in the second trial was the same as the one he unsuccessfully advanced in the first trial, i.e., that his wife used his gun to kill Makea Stewart.

In the first trial, as in the second, the State's evidence against appellant was based on circumstantial evidence, namely: (1) immediately after the victim was shot, an African–American male ran from the scene and drove away in a two-door Mazda with a faulty muffler; (2) appellant owned a car that sounded and looked like the one seen leaving the murder scene; (3) several days after the murder, the police seized a gun owned by appellant from appellant's car; (4) two ballistics experts testified that the gun found in appellant's car fired the shots that killed the victim; (5) blood and tissue of the victim, together with appellant's fingerprint, were found on appellant's gun; (6) appellant had a motive to kill the victim; and (7) the victim's pager, which was found near her body shortly after the murder, showed that a call had been made to her pager about one-half hour before the 3:30 a.m. murder, from a cellular phone later found in appellant's possession.

A major problem in retrying appellant was the fact that some of the physical evidence used to convict in the first trial

was inadvertently destroyed by the police after the first trial. The items that were destroyed and the dates of their destruction were: (1) the bullets recovered from the victim's body—destroyed in February 2000; (2) the shell casings found next to the victim's body—destroyed between April 19 and June 27, 2000; and (3) the murder weapon, which was owned by appellant—destroyed on October 13, 2000. The destruction of these items was due to a series of mistakes by the Baltimore City Police Department.

In this appeal, appellant raises five questions, *viz:*

1. Was appellant's right to a speedy trial violated by a nineteen-month delay between the date of the Court of Appeals mandate and the date that the second trial commenced?

2. Did the trial judge commit reversible error by denying appellant's motions for a mistrial, which were based on the fact that the jury was repeatedly reminded by various witnesses that defendant had previously stood trial?

3. Did the trial court err in failing to suppress evidence uncovered as a result of a validly issued search warrant that was executed by police officers in a venue where they had no jurisdiction?

4. Did the trial court commit reversible error in allowing the prosecutor to play a videotape of appellant's testimony from the first trial when appellant's testimony in that prior trial was "compelled" by the erroneous admission into evidence in the first trial of testimony that violated appellant's marital privilege?

5. Did the trial judge improperly enhance the sentence appellant received on remand for the handgun conviction?

## ISSUE 1: DENIAL OF MOTION TO DISMISS
## FOR LACK OF SPEEDY TRIAL

As mentioned earlier, the mandate of the Court of Appeals in *Brown v. State* was filed on July 10, 2000. Appel-

lant's second trial commenced almost exactly nineteen months later on February 11, 2002. Appellant contends that a delay of this magnitude denied him his right to a speedy trial. In deciding whether appellant's right to a speedy trial was unconstitutionally abridged, we consider only the period between the date the mandate was issued and the date that trial commenced. *See Icgoren v. State,* 103 Md.App. 407, 420, 653 A.2d 972 (1995)(When deciding a speedy trial issue, courts are generally "only concerned with the period between the receipt of an appellate mandate, if the prior conviction is reversed, and the subsequent retrial.").

■ The right of an accused to a speedy trial is guaranteed by Article 21 of the Maryland Declaration of Rights, as well as by the Sixth Amendment to the Constitution of the United States.[1] Maryland Courts usually construe Article 21 in accord with the Supreme Court's construction of the Sixth Amendment's speedy-trial right, inasmuch as the Supreme Court's interpretation is "very persuasive, although not necessarily controlling." *Stewart v. State,* 282 Md. 557, 570, 386 A.2d 1206 (1978).

In 1972, the Supreme Court established a four-factor test to aid in determining whether a defendant's constitutional right to a speedy trial was violated. *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). Those factors are: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right, and (4) the prejudice to the defendant. *State v. Bailey,* 319 Md. 392, 409, 572 A.2d 544 (1990). Maryland has adopted these factors as aids to be used by courts in evaluating whether the State has violated its own speedy trial requirements. *Divver v. State,* 356 Md. 379, 388, 739 A.2d 71 (1999).

---

1. The 6th Amendment of the United States Constitution provides: "[I]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial...."

Article 21 of the Maryland Declaration of Rights states, "[I]n all criminal prosecutions, every man hath a right ... to a speedy trial by an impartial jury...."

In this case, the trial judge held a hearing concerning appellant's motion to dismiss for lack of speedy trial. The court denied the motion. In reviewing the motions court's denial, we accept the circuit court's findings of facts unless clearly erroneous, *Borgen v. State*, 58 Md.App. 61, 75, 472 A.2d 114 (1984), but we make our own independent constitutional appraisal. *State v. Bailey*, 319 Md. at 415, 572 A.2d 544. As the Court of Appeals has reminded us, the review of a speedy trial motion should be "practical, not illusionary, realistic, not theoretical, and tightly prescribed, not reaching beyond the peculiar facts of the particular case." *Id.*

In this case, the trial court concluded that the nineteen-month delay from the date of the mandate to the commencement of the trial was of constitutional dimensions. Whether a delay is of constitutional dimensions must be decided "in light of the complexity of the case and the severity of the charges." *Dalton v. State*, 87 Md.App. 673, 686, 591 A.2d 531 (1991).

In discussing the first prong of the *Barker* factors, the Court of Appeals, in *Glover* [ *v. State*, 368 Md. 211, 792 A.2d 1160 (2002) ], reasoned that "the delay that can be tolerated is dependent, at least to some degree, on the crime for which the defendant has been indicted." *Glover* [ *v. State* ], 368 Md. [211,] 224, 792 A.2d 1160 [ (2002) ](citing *Barker*, 407 U.S. at 531, 92 S.Ct. 2182). The Court of Appeals contrasted *Divver v. State*, 356 Md. 379, 739 A.2d 71 (1999), in which appellant was being tried for driving under the influence[,] and a delay of twelve months and sixteen days was held unreasonable.

Notwithstanding, the fact that trial did not commence for over eighteen months is not dispositive. The Court of Appeals held, in *Erbe v. State*, 276 Md. 541, 547, 350 A.2d 640 (1976), that "delay is the least conclusive of the four factors identified in *Barker.*" *Erbe*, 276 Md. at 547 [350 A.2d 640] (quoting *United States v. Brown*, 354 F.Supp. 1000, 1002 (E.D.Pa.1973)). Indeed, in *Barker*, the delay was

in excess of three years, yet not held unreasonable when balanced with the other factors.

*Wilson v. State,* 148 Md.App. 601, 632, 814 A.2d 1 (2002).

■ Here, the case was complex, and the charges were extremely serious ones. Nevertheless, we agree with the trial court that the delay was sufficiently protracted so as to be of constitutional dimensions. *See Epps v. State,* 276 Md. 96, 111, 345 A.2d 62 (1975)(A robbery case where a delay of one year and fourteen days was "sufficiently inordinate to constitute a 'triggering mechanism.' "); *Icgoren,* 103 Md.App. at 423, 653 A.2d 972 (A murder trial in which a delay of eleven months from date of mistrial to retrial was held to be "barely . . . of constitutional dimension[s]."). *See also Lewis v. State,* 71 Md.App. 402, 417, 526 A.2d 66 (1987)(Nineteen-and-a-half-month delay was presumptively prejudicial.).

■■ Because a nineteen-month delay is of constitutional dimensions, we must next consider the reasons for delay. In doing so, a court should assign different weight to various reasons for the delay, depending on who is at fault. This was explained in *Marks v. State,* 84 Md.App. 269, 578 A.2d 828 (1990):

> "A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay."

*Id.* at 282, 578 A.2d 828 (quoting *Barker,* 407 U.S. at 531, 92 S.Ct. 2182).

The trial judge, in making his *Barker v. Wingo* analysis, divided the nineteen-month delay into discrete time periods. We shall do likewise.

## A. *The Period Between the July 10, 2000, Mandate and the First Scheduled Trial Date on March 27, 2001*

The trial court concluded that the approximately eight-and-a-half-month period that went by between the date of the mandate and the date of the first scheduled trial date was necessary for the orderly administration of justice and constituted a reasonable amount of time to allow the State and the defendant to prepare for trial.

## B. *Period Between March 27, 2001, and July 11, 2001*

On the date the trial was initially set to commence, March 27, 2001, the State asked for a postponement. The reason for the request was due to the unavailability of Jerry Manns, who had testified in the first trial that at the approximate time of the murder he was near the scene of the murder and (1) heard several gunshots; (2) saw a lone African–American male run from the murder scene, and drive away; (3) saw the African–American male return and then heard an additional shot fired; (4) saw the lone male leave once again in a small two-door car with a defective muffler. Manns was a crucial witness for the State, because his testimony seriously undermined appellant's defense that his wife killed the victim.

As a ground for the continuance, the prosecutor told the trial judge that the State had located Mr. Manns, in Ohio, only a few days previously. The State proffered that it had been unable to find Manns earlier because, although a detective had been sent to Manns's last-known address in Maryland, family members in Maryland had been "totally uncooperative" and would not provide information about Manns's whereabouts. According to the prosecutor's representation, the detective discovered, only a few days before March 27, 2001, that Manns had moved to Columbus, Ohio. The prosecutor stressed that Manns's live testimony was necessary because at the first trial the judge inadvertently failed to tape record Manns's testimony.

Appellant's counsel vigorously opposed the request for a continuance, but it was nevertheless granted. Trial was reset for July 11, 2001.

## C. *July 11, 2001, Postponement*

On the morning of July 11, 2001, the prosecutor again asked for a postponement due to the State's inability to produce Manns for trial. The prosecutor proffered that the Baltimore City detective working on this case had contacted the Franklin County prosecutor's office in Columbus, Ohio; a woman employee was assigned by the Columbus police to assist Maryland in obtaining Manns's presence for trial. The woman assigned to the job repeatedly failed to return calls from the prosecutor's office. The prosecutor subsequently learned that the woman had been terminated and that prior to her termination she had failed to take any of the steps necessary to have Manns served in Ohio. When this problem was discovered, the State contacted a Detective Feldman from the Columbus homicide division, who located Manns at a new address. Manns was very uncooperative with Detective Feldman and said that he would not return to Maryland for trial and "would not accept any service." Again, over the vigorous objection of appellant, the State received a postponement.

Because of the necessity for the second postponement, the prosecutor offered to set the case in for September 2001, but this could not be done due to a conflict with defense counsel's schedule. Trial was re-set for November 5, 2001.

## D. *Postponement of the November 5, 2001, Trial Date*

On November 5, 2001, both the State and the defendant were ready for trial, but a courtroom was unavailable. The case was continued for nine days.

## E. *November 14, 2001, Postponement*

All parties were again available to begin trial on November 14, 2001, but another murder case was put on the schedule ahead of the subject case. The prosecutor suggested that the trial be placed on the "move list," which meant that the case would start any time a judge became available. Defense counsel opposed that suggested solution, however, on the grounds that unless the trial started immediately there would

not be enough time to complete the case before conflicts in his schedule developed. The case was reset for February 4, 2002.

### F. *February 4, 2002, Postponement*

On February 4, 2002, a three-day postponement was granted due to the fact that the lead homicide investigator in the case, Frank Barlow, had retired and was on vacation until February 7.

The morning and afternoon of February 7 were devoted to the court hearing line-by-line arguments concerning what portions of the videotape of appellant's prior trial testimony could be introduced. In the late afternoon of February 7, counsel for appellant asked that the videotape be edited "to avoid showing the jury either the judge, the prosecutor, or the defense attorney." Counsel's request was made in order to minimize the chance of disclosure to the jury of the fact that there had been a previous trial. The trial judge granted a continuance so that the State could, if possible, edit the videotape to "eliminate the picture of anybody except the witness." Trial commenced on Monday, February 11, 2002.

### Analysis

As already mentioned, the trial court ruled that the period between July 10, 2000, and March 27, 2001, was the "ordinary and usual period of time" necessary for "preparation and arrangement for trial" and was neutral.

The prosecutor who had tried the first case had become a District Court judge in the interim, and since the first trial, the original trial counsel for appellant had been disbarred. New counsel for appellant did not enter his appearance until October 16, 2000. There were voluminous trial transcripts and trial exhibits to be reviewed and numerous witnesses to be contacted and re-interviewed. Appellant does not take issue with the court's finding that the first eight-and-a-half months of delay should not be weighed against either the State or the defense. We agree that the first eight and one-half months of the delay were neutral.

The period between March 27 and July 10, 2001, and between July 10 and November 5, 2001, was weighed against the State by the trial court. The court reasoned that if the delay had been caused by a "pure" witness problem, the delay in securing Mr. Manns's presence at trial would be considered neutral. But the motions judge weighed against the State the fact that it had not exercised sufficient diligence in securing Manns's trial testimony. In the words of the motions judge, "the conduct of the State was not egregious, but it is more serious than neutral unavailability of a witness."

The State does not take issue with the court's finding concerning the delay between March 27 and September, 2001. It argues, however, that the delay between September 2001 and November 27, 2001, should be considered neutral because defense counsel was offered a September trial date by the prosecutor, but the offer was not accepted due to defense counsel's unavailability. In this regard, the State cites *Wilson v. State*, 148 Md.App. 601, 640, 814 A.2d 1 (2002). *Wilson*, however, does not constitute authority for counting the time after September 2001 against appellant.

In *Wilson*, appellant's counsel, because of a prior commitment, was obliged to ask for a continuance of a trial date, which the court had set. Unlike *Wilson*, appellant's counsel never asked for a postponement of any trial date; instead, he simply made it known that a suggested (earlier) trial date was unacceptable. Nevertheless, the fact that defense counsel prevented the scheduling of an earlier trial is entitled to at least some consideration, insofar as it explains, in part, the nineteen-month delay, and it shows that the State was not intentionally trying to deprive appellant of his speedy trial right.

The continuances granted on November 5, 2001, and November 14, 2001, were caused solely by the unavailability of a courtroom. The lower court weighted that delay against the State, and we agree. The weight that should be accorded that delay, however, is minimal. *See Divver*, 356 Md. at 391, 739 A.2d 71 (Overcrowded court should be weighted less heavily

but nevertheless should be considered because ultimate responsibility for such circumstances rests with the State.). *But see Glover v. State,* 368 Md. 211, 227, 792 A.2d 1160 (2002)(Unavailability of a judge and jury due to overcrowded docket is deemed neutral.).

Additionally, the fault for the delay between November 14, 2001, and February 4, 2002, is ameliorated somewhat by the fact that on November 14, 2001, the prosecutor offered to start the case as soon as a courtroom was available after November 14, 2001. Unfortunately, however, because of defense counsel's busy schedule, the offer was not accepted.

The one-week delay between February 4 and February 11 was not weighed by the motions judge because appellant's motion to dismiss was heard prior to February 4, 2002. Three days of that delay were due to the unavailability of a witness, and the remainder was occasioned by appellant's request to edit the tape of his prior testimony. We consider the first delay against the State, and the second against the appellant, although the weight of either is *de minimis* as to both.

## II. *DEFENDANT'S ASSERTION OF HIS RIGHT TO SPEEDY TRIAL*

On January 5, 2001, appellant filed a motion to dismiss the indictment on speedy-trial grounds. Thereafter, he vigorously asserted his speedy-trial right.

The State concedes, and we agree, that appellant, since January 5, 2001, has consistently and persistently asserted his right to a speedy trial.

## III. *THE PREJUDICE TO DEFENDANT*

In *Barker,* the Supreme Court said:

A fourth factor is prejudice to the defendant. Prejudice, of course, should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect. This Court has identified three such interests: (i) to prevent oppressive pre[-] trial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit

the possibility that the defense will be impaired. Of these, the most serious is the last, because the inability of a defendant adequately to prepare his [or her] case skews the fairness of the entire system. If witnesses die or disappear during a delay, the prejudice is obvious. There is also prejudice if defense witnesses are unable to recall accurately events of the distant past. Loss of memory, however, is not always reflected in the record because what has been forgotten can rarely be shown.

*Barker,* 407 U.S. at 532, 92 S.Ct. 2182.

In *Icgoren,* 103 Md.App. at 421–22, 653 A.2d 972, we said:

"A problem peculiar to the *Barker* test is its use of the terms *presumption of prejudice* and *actual prejudice.* When there has been a lengthy pretrial delay, one of constitutional dimension, then a presumption arises that the defendant has been deprived of his right to a speedy trial; a presumption of prejudice. Once this presumption asserts itself, a balancing test must be employed which involves a weighing of four factors, one of which is actual prejudice. Actual prejudice involves a consideration of three interests the speedy trial right is meant to protect. Whatever importance it assumes in the final outcome is a function of the facts of the particular case."

*Icgoren,* 103 Md.App. at 421–22, 653 A.2d 972 (quoting *Brady v. State,* 291 Md. 261, 266, 434 A.2d 574 (1981)); *accord Divver,* 356 Md. at 392, 739 A.2d 71 (distinguishing presumption of prejudice that is created by the length of delay from actual prejudice).

In regard to the actual prejudice factor, appellant stresses that he has been in jail since one week after the date of the murder. While factually true, the pre-trial incarceration with which we are concerned is the nineteen months between the date of the Court of Appeals mandate and the date of trial. The incarceration between September 1995 and July 10, 2000, is simply irrelevant for speedy trial purposes. *Icgoren,* 103 Md.App. at 420, 653 A.2d 972.

Although there was no testimony to this effect at the hearing on the motion to dismiss for lack of a speedy trial,

appellant says, in his brief, that he "had endured the anxiety and concerns that come with a life without parole sentence, which 'hung over his head' during his pre-trial incarceration." No sentence "hung over" appellant's head between July 10, 2000, and February 11, 2002. The *possibility* of a life sentence with no parole did, however, "hang over" appellant's head. Even assuming, *arguendo*, that appellant did experience some generalized anxiety, allegations of anxiety of this type are accorded little weight. *See Wheeler v. State*, 88 Md.App. 512, 525, 596 A.2d 78 (1991)(Assertion by defendant that he suffered oppressive pre-trial incarceration and was anxious, without specifying nature of oppression or anxiety, was accorded little significance.).

As we recently said in *Wilson, supra:*

The most important factor establishing prejudice ... is the inability to prepare one's defense.

148 Md.App. at 639, 814 A.2d 1.

In this regard, appellant contends that because of the State's "gross negligence," he was denied his rights

of discovery and confrontation includ[ing] his right, subject to appropriate protective order, to have independent testing performed on a weapon, particularly when the weapon is the best, arguably, the only, way to establish criminal agency in a circumstantial evidence case.

This argument overlooks several facts. First, there was no dispute at either trial that the .380 caliber gun, which the police experts tested and which was found in appellant's car after the murder, was owned by appellant. The gun had appellant's fingerprints on it, and appellant admitted at the first trial that he owned that weapon. It was also never disputed that DNA tests showed that the victim's blood and tissue were on appellant's gun when it was seized by the police about one week after the murder. And, at no time did defense counsel ever seek to examine the blood or tissue recovered, nor was there any challenge to the DNA evidence. Thus, appellant's gun was not linked to the murder based solely on ballistic tests. Second, prior to the first trial, appellant had

ample opportunity to test the gun if he seriously thought that the State's ballistic experts were mistaken in their belief that bullets fired from his gun killed Makea Stewart. He did not avail himself of that opportunity, however. Instead, his defense at the first trial (and at the second) was that his wife used *his* gun to kill the victim. Third, appellant's argument loses sight of the fact that, in analyzing prejudice caused by delay, we look exclusively at the prejudice caused by the nineteen-month delay between the filing of the Court of Appeals mandate and trial. *See Ratchford v. State*, 141 Md. App. 354, 360–61, 785 A.2d 826 (2001), and *Icgoren*, 103 Md.App. at 435, 653 A.2d 972.

Prior to July 10, 2000, the police had destroyed all the shell casings they had recovered along with the bullets that were taken from the victim's body. Therefore, prior to the time the speedy-trial clock started ticking, the evidence needed to perform the ballistic comparison had already been lost. While it is true that appellant's gun was destroyed by the police on October 13, 2000, which was about three months after the speedy trial "clock began ticking," the destruction of the gun did not cause appellant prejudice because, by that time, even if the gun had not been destroyed, there would be no bullets or casings with which to perform a ballistic comparison. Thus the delay between July 10, 2000, and February 11, 2002, did not cause appellant to fail to perform any useful discovery. Moreover, no other actual prejudice was caused by the delay.

As mentioned earlier, the trial judge balanced the various *Barker* factors, and denied appellant's motion to dismiss the indictment on speedy-trial grounds. In our view, the motions judge did not err.

*Wilson, supra,* is factually analogous to the case at bar. In *Wilson,* there was an eighteen-month delay between the date of Ismall Wilson's arrest and the commencement of his murder trial. Seven months of that delay (between the arrest on December 7, 1999, and the first trial date on July 6, 2000) were deemed to be neutral. *Wilson,* 148 Md.App. at 628, 814 A.2d 1. And Wilson, like appellant, timely invoked his right to a speedy trial. *Id.* at 637, 814 A.2d 1.

As against *Wilson*, twelve months of the delay were chargeable against the State, the last four months of which were heavily charged against the State for failure to provide discovery. *Id.* at 640, 814 A.2d 1. In *Wilson*, no demonstrable prejudice was shown, and therefore, we held that dismissal of the case was not warranted. *Id.* at 651, 814 A.2d 1. Nevertheless, we said in *Wilson:*

> In our view, the lack of diligence in providing counsel for Wilson and McCoy discoverable materials, including the six[-] month delay in submitting evidence for DNA testing, would warrant a dismissal of the charges against them were they able to establish demonstrable prejudice.

*Id.* at 640, 814 A.2d 1.

 Here, approximately ten and one-half months of the delay are chargeable to the State (from March 27, 2001, to February 7, 2002). The seven-and-one-half-month delay (March 22—November 5, 2001), due to the State's inability to ensure Mr. Manns's attendance at trial, is appropriately weighed more heavily against the State than is the remainder of the delay (November 6, 2001, to February 4, 2002), which was caused by the unavailability of a judge or a courtroom. The State's intentional failure to provide discovery in *Wilson* was much more egregious and weighs more heavily against the State than the State's failure in this case to locate and subpoena Mr. Manns or make a judge and a courtroom available. Although we believe, as did the *Wilson* Court, that the delay in this case "would warrant dismissal of the charges" if appellant was "able to demonstrate [actual] prejudice," here, as in *Wilson*, no actual prejudice was shown. In light of the fact that there was no actual prejudice (in the sense that appellant's defense was weakened) and considering the seriousness and complexity of the case, we hold that the motions judge did not err in denying appellant's motion to dismiss for lack of a speedy trial.[2]

---

**2.** The case of *Gillis v. State*, 44 Md.App. 265, 408 A.2d 749 (1979), cited by appellant, is inapposite. There, nine months of an eighteen-month

## ISSUE 2: DENIAL OF MISTRIAL MOTIONS

Prior to trial, appellant's counsel filed a motion *in limine* to prohibit the State or its witnesses from communicating to the jury the fact that appellant previously had been tried or convicted or incarcerated in the Division of Corrections. This motion was granted. Appellant also asked the trial judge to preclude the State from showing a two-hour videotape of appellant's testimony at the first trial on the grounds that it would communicate to the jury that there had been a prior trial. The trial judge denied this part of the motion *in limine,* but in an effort to partially ameliorate some of appellant's concerns, he directed that "no one will expressly state [that there was] a formal trial and conviction," citing *Coffey v. State,* 100 Md.App. 587, 642 A.2d 276 (1994). The trial judge explained that he was imposing this rule "with the understanding that everyone is seeking to avoid conveying [to] the jury the impression that there was a previous conviction."

Appellant contends that the trial court committed reversible error in allowing the jury to see the two-hour videotape. Appellant argues:

---

delay were attributable to the State's actions in filing new charges against appellant and the State's decision to proceed first on those new charges. *Id.* at 271, 408 A.2d 749. "Tactical decisions within the prosecutor's office and equivocation by the court were the reasons" that appellant did not get an earlier trial date. *Id.* Those causes for delay were weighed heavily against the State in *Gillis* and contrast vividly with the State's actions in this case.

Appellant also relies on *Evans v. State,* 30 Md.App. 423, 352 A.2d 343 (1976), a case that was dismissed on speedy trial grounds. Although the delay in *Evans* is of the same overall magnitude as the delay in this case, it is distinguishable because Evans was charged with a relatively simple and easily provable crime, i.e., the sale of three bags of heroin to an undercover police officer. *Id.* at 424, 352 A.2d 343. And, five-and-a-half months of the delay were caused by a police officer's unexplained failure to attend appellant's preliminary hearing on six separate occasions. *Id.* at 426, 352 A.2d 343. Lastly, the time chargeable against the State in *Evans* was sixteen months; neutral time chargeable was one month; and time chargeable against appellant was two months. In the case *sub judice,* much more of the delay was neutral-or only lightly weighed against the State.

[T]he jury saw a courtroom, with a judge (although a different judge), a defendant (five years younger) being sworn in as a witness and testifying, a prosecutor (one African–American male now replaced by a white female and an African–American female), and a defense team (one Hispanic female now replaced by two white males). Moreover, in addition to Mr. Brown's testimony, the two-hour videotape included questions, objections, and argument by opposing counsel, plus constant interplay with the judge.

Later, in his brief, appellant continues,

On the videotape, Mr. Brown was sworn in as a witness. Even though the clerk was not visible, the current jury—then in its ninth day of a 17–day trial and dozens of witnesses later—certainly recognized the routine. Throughout more than two hours of videotape, barely a minute elapsed that was not "peppered" with comments from the judge, the prosecutor, and defense counsel—all different than the ones seen for the last nine days. There were questions, answers, references to prior testimony, references to the same detective who testified in this case, objections, argument, rulings on objections, moving a [d]efendant's exhibit into evidence, and stating that Mr. Brown was currently incarcerated.

Besides objecting to the showing of the videotape, appellant contends that the trial judge erred in failing to grant a mistrial based on various statements of the prosecution witnesses, which conveyed to the jury the message that there had been a previous trial in which appellant was the defendant.

Because the shell casings, bullets, and gun had been destroyed, the State found it necessary to introduce photographs of the missing items at the second trial. These photographs were sponsored by police witnesses who had testified in the first trial and were called upon to explain why the gun and other items were not being presented. In the course of presenting this testimony, one of the witnesses used the phrase "last trial" in one of his answers and another witness, after being asked when he made a change to a report, said, "I

made this change before[,] I think[,] the first trial. . . ." Appellant's counsel made a motion for mistrial immediately after each of the witnesses uttered the forbidden phrases "last trial" and "first trial." The motions were denied. Additionally, in explaining the use of the photographs, various witnesses used, in the course of their testimony, the phrases "in court," "introduced into evidence," and "in a proceeding [that has been] concluded." Appellant's counsel made various motions for mistrial in regard to these answers also, on the grounds that the answers "basically told the jury that there was a prior trial in this case. . . ."

In this appeal, the central thread that runs through appellant's argument concerning the various mistrial motions, is that a criminal defendant is entitled to a mistrial any time the jury learns that the defendant presently on trial has previously stood trial for the same offense. In support of that argument, appellant places primary reliance upon *Coffey v. State, supra.*

Preliminarily, it is worth mentioning that the trial judge, before allowing into evidence the two-hour videotape, made the following comment:

> We do as much as we can to minimize that risk [that the jury will know of a prior trial] and we've already discussed those things here, but the risk is always present so we're not talking about introducing a risk, we're talking about enhancement of the risk or minimizing the risk, depending upon how you look at the issue.

> And I am satisfied that the probative value outweighs the risk of undue prejudice, the risk of undue prejudice being an increase in risk that the jury will conclude there was a previous trial. *There is a difference, I think, between a conclusion by the jury that there was a previous trial and straight out stating to the jury this [d]efendant has already been convicted once of this crime by a jury.*

(Emphasis added.)

Although the State argues otherwise, we agree with appellant that, by the end of the sixteen-day trial, any

juror who was awake during the course of the trial would have known that appellant had been tried previously for the killing of Makea Stewart. Jurors who served in the second trial, however, would not have known that appellant previously had been convicted of any crime connected with Stewart's murder. This distinction is crucial, as pointed out by the trial judge.

In *Coffey*, appellant was convicted of a drug offense, but the conviction was vacated on appeal. 100 Md.App. at 588, 642 A.2d 276. Between the first and second trial, both the drugs and the photograph of the drugs, which were entered into evidence at the first trial, were lost by the State. *Id.* at 595, 642 A.2d 276. Witnesses called by the State were required to explain the absence of the evidence. On two separate occasions, police officers gave answers that revealed the fact that appellant previously had been tried for the same crimes for which he presently was being tried. On the second occasion when this occurred, the police officer revealed not only that appellant previously had stood trial, he also revealed that the defendant previously had been convicted. *Id.* at 594, 642 A.2d 276. The *Coffey* Court said: "We must determine whether in a criminal case, where a defendant is retried on the same charges, does an experienced police officer's mention of the defendant's previous trial and conviction for the same charges ordinarily warrant a mistrial." *Id.* at 598, 642 A.2d 276.

In *Coffey*, we held that the trial court erred in failing to grant appellant's motion for a mistrial. *Id.* at 606, 642 A.2d 276. In doing so, we focused upon the prejudicial effect of the disclosure of a prior conviction—not upon the disclosure that appellant previously had been tried for the same offense.

We recognize that the nature of the defense—that the State could not produce a critical portion of the corpus delicti (i.e., the CDS)—required the State to explain the absence of the physical evidence and consequently the evidence of a prior trial. The blurt, however, of a conviction in this very case was so egregious that notwithstanding the trial judge's valiant efforts to avoid a mistrial, through the issuance of curative instructions, a mistrial was the only cure. Accordingly, we conclude that when the jury learned

of appellant's prior trial and conviction on the very same charges, this information was "so prejudicial that it denied the defendant a fair trial" and "transcended the curative effect of the instruction." *Rainville* [*v. State,* 328 Md. 398] at 408, 614 A.2d 949 (quoting *Kosmas v. State,* 316 Md. 587, 594, 560 A.2d 1137 (1989)).

*Id.*

The distinction between the mention of the fact that the defendant had been previously convicted in contradistinction to mention of the fact that there had been a previous trial was underscored in *Poole v. State,* 295 Md. 167, 453 A.2d 1218 (1983). In *Poole,* the defendant contended "that the trial court erred in not granting his motion for a mistrial when, on two separate occasions, reference was made to [his] former trial." *Id.* at 193, 453 A.2d 1218. The Court rejected Poole's contention, explaining that while the witness's reference to "the last trial" or "the last time" might have conveyed the fact of a previous trial to the jury, "we do not believe any error was necessarily prejudicial to [the defendant's] right to a fair trial; certainly not to warrant concluding that the trial court abused its discretion in denying the motion for a mistrial." *Id.* at 194, 453 A.2d 1218.

The aforementioned distinction was more recently highlighted in *Morgan v. State,* 134 Md.App. 113, 141–43, 759 A.2d 306 (2000). In *Morgan,* we distinguished *Coffey* by saying that "the prosecutor's reference to an 'earlier trial date' neither informed the jury that appellant had previously been tried for the same offense or that there had been a conviction therefor." *Id.* at 142, 759 A.2d 306. We rejected Morgan's argument that there was a "substantial possibility, if not a probability," that one or more of the jurors drew an inference that he had been found guilty at a prior trial in this matter. *Id.* What the *Morgan* Court said is here apposite.

[T]he testimony of Gladney made no mention of defendant's prior conviction. The jury, therefore, had no way of inferring that the reference to the "earlier trial date" was, in fact, appellant's trial. The trial judge asked both counsel to

approach the bench, at which time the judge admonished the prosecutor, but was not asked to give a curative instruction to the jury regarding the remarks. The court's failure to give a curative instruction, we conclude from the record, avoided calling the jury's attention to the matter.

... The Court of Appeals explained in *Poole* that, even if the jury inferred from the State's witness that there had been a prior trial, that inference, in and of itself, was not necessarily prejudicial to the appellant's right to a fair trial.... *Thus, in* Poole, *the Court held that the jury's knowledge of a prior trial alone, did not warrant concluding that the trial judge abused his discretion in denying a motion for mistrial.*

*Id.* at 142–43, 759 A.2d 306 (emphasis added).

Appellant places great reliance on *Rainville v. State*, 328 Md. 398, 614 A.2d 949 (1992). Robert Rainville rented a room from Elisa Turner ("Elisa") and her fiancé. Elisa's children also lived at the house. *Id.* Sometime in June 1989, Rainville was arrested for child abuse, third degree sexual offense, and battery of Michael, Elisa's nine-year-old son. *Id.* Shortly after Rainville's arrest for the crimes against Michael, Elisa's seven-year-old daughter, Peggy, reported to her mother that Rainville had "placed his penis in her [Peggy's] mouth, and then successively in her mouth and rectum." *Id.* The police were again called, and Rainville was charged with second degree rape of Peggy and other offenses. *Id.*

When Rainville stood trial for his alleged sexually assaultive behavior against Peggy, Elisa was called to the stand and the following transpired:

PROSECUTOR: Now, if you would, describe for the gentlemen of the jury Peggy's demeanor when she told you about the incident?

THE MOTHER: She was very upset. I had noticed for several days a difference in her actions. She came to me and she said where Bob [Rainville] was in jail for what he had done to Michael that she was not afraid to tell me what had happened.

Defense counsel immediately objected and moved for a mistrial at a bench conference which followed, arguing that the defendant's case had been "hopelessly prejudiced." The trial judge denied the motion, but said he would give a curative instruction, and asked whether the defendant would prefer that the instruction be given immediately or only during final instructions to the jury. Defense counsel asked for an immediate instruction, and the judge instructed the jury as follows:

> THE COURT: Gentlemen of the jury, the witness just alluded to some other incident that has nothing to do with this case, and you should not in any way consider what she has said, and you should put it out of your mind and forget about it. Does anybody have any questions about that? Okay. Let's go.

*Id.* at 401–02, 614 A.2d 949.

Rainville was subsequently convicted of the second degree sex offense of fellatio and assault and battery. *Id.* at 402, 614 A.2d 949.

On appeal, Rainville contended, *inter alia*, that the trial judge had abused his discretion by denying his mistrial motion. The Court of Appeals agreed. *Id.* at 407–11, 614 A.2d 949. The *Rainville* Court stressed that the issue was "difficult" because the State's case "rested almost entirely upon the testimony of a seven-year-old girl" and some of that testimony was contradicted by her brother, Michael. *Id.* at 409–10, 614 A.2d 949. Moreover, what Peggy testified to at trial was inconsistent with what she told the police. *Id.* at 410, 614 A.2d 949.

In *Rainville*, the Court said:

> The mother's testimony that the defendant was "in jail for what he had done to Michael" was particularly prejudicial because the defendant had not been convicted of any sexual offenses against Michael, but was being held in jail pending trial on those charges. Moreover, it is highly likely that the jury assumed that "what [the defendant] had done to Michael" was a crime similar to the alleged crimes against

Peggy. *See State v. Goodrich,* 432 A.2d 413, 417 (Me. 1981)(in prosecution for rape of ten-year-old daughter, mother's reference to unspecified incident " 'with the other girl' informed the jury that the defendant may have been involved in unlawful sexual activity with someone other than the prosecutrix, thus unfairly prejudicing the jury against him").

*Id.* at 407, 614 A.2d 949 (footnote omitted).

Later, the *Rainville* Court concluded:

It is highly probable that the inadmissible evidence in this case had such a devastating and pervasive effect that no curative instruction, no matter how quickly and ably given, could salvage a fair trial for the defendant. The defendant is not to blame—he anticipated the possibility of just such a problem, and prudently attempted to avoid it. Adhering to the principle that "an accused may be convicted only by evidence which shows that he is guilty of the offense charged, and not by evidence which indicates his guilt of entirely unrelated crimes, . . ." *Ross v. State,* 276 Md. 664, 669, 350 A.2d 680 (1976), we reverse and remand for a new trial.

*Id.* at 411, 614 A.2d 949.

We fail to see any analogy between the facts presented in this case and those dealt with in *Rainville.* Here, no witness intimated that appellant had ever committed any crime other than the one for which he was charged.

For the foregoing reason, we reject appellant's argument that the trial judge erred in allowing the jury to see a videotape of appellant's prior testimony; likewise, we reject appellant's contention that the trial judge committed reversible error by failing to grant a mistrial after the jury learned that appellant previously had stood trial for the same charges he once again faced.

## ISSUE 3: DENIAL OF APPELLANT'S SUPPRESSION MOTION

Appellant contends that the circuit court erred in denying his motion to suppress evidence seized from his car pursuant

to a search warrant. The search warrant was issued by a judge of the District Court of Maryland for Baltimore City. The warrant allowed the officers to search appellant's apartment located in Baltimore County, where appellant lived; to search appellant's person; and to search two automobiles he owned. The search warrant was executed on September 15, 1995, in Baltimore County by Baltimore City police officers who were accompanied by a U.S. Marshal and three Deputy U.S. Marshals.

Appellant admits that the search warrant was valid. He contends, however, that Baltimore City police officers acted illegally by executing the search warrant out of their jurisdiction without the presence of "local [Baltimore County] police or sheriffs." In making this argument, appellant places primary reliance on *Brown v. State*, 132 Md.App. 250, 752 A.2d 620 (2000), *aff'd*, 364 Md. 37, 770 A.2d 679 (2001).

In *Brown*, Prince George's County police officers obtained a search warrant for the defendant's car. 132 Md.App. at 256, 752 A.2d 620. Prior to the execution of a warrant, the car was moved to the District of Columbia. *Id.* Without the knowledge or participation of District of Columbia officials, Prince George's County officers seized the car in Washington, D.C., and towed it back to Maryland. *Id.* at 256, 752 A.2d 620. We held in *Brown* that because of exigent circumstances and because the search was conducted in Prince George's County, and not a "foreign jurisdiction," the police officers did not act in bad faith, nor did they act unreasonably under the Fourth Amendment, and therefore the exclusionary rule did not apply. *Id.* at 269–70, 752 A.2d 620. On appeal, the Court of Appeals said that the "central issue" to be decided was

whether the Circuit Court for Prince George's County erred in refusing to suppress evidence obtained from a car that was located and seized in Washington, D.C., transported to Maryland, and searched by police pursuant to a Prince George's County search warrant, where the removal of a car from the District of Columbia was done without the owner's permission or the cooperation of Washington, D.C., authorities.

*Brown,* 364 Md. at 38, 770 A.2d 679. The Court of Appeals in *Brown* did not reach the merits of that question, however, because, in the view of the majority, the admission of any evidence taken from the car would have been harmless beyond a reasonable doubt. *Id.*

Appellant relies upon language used by Chief Judge Robert Bell, who dissented in *Brown.* Judge Bell said:

> In this case, there can be no doubt that the police officers had knowledge of the illegality of the seizure of the petitioner's car, or, at the very least, is chargeable with that knowledge. A search warrant issued by one jurisdiction does not have extra-territorial effect, such that it can be executed by the officials of the issuing jurisdiction in another jurisdiction, without the knowledge or assistance of that other jurisdiction. That is so clear that bad faith can be attributed to the officers for proceeding as they did. The fruits of the search must be suppressed.

*Id.* at 45, 770 A.2d 679.

Judge Bell continued:

> In the case of an illegal search and, as in this case, seizure, this means adjudicating the issue, labeling the seizure of the car from the District of Columbia, without benefit of assistance from the District of Columbia officials, as illegal and expressly and unequivocally, excluding its use, as well as its fruits, as evidence. There simply is no doubt in this case, as previously indicated, that the police conduct was willful and that the police had knowledge, or should have known, of the illegality of the seizure of the car in the District of Columbia.

*Id.* at 46, 770 A.2d 679.

■ The language used in the *Brown* dissent does not help appellant. Here, the search warrant was issued by a District Court judge. The District Court is a single unified court, divided into districts, with uniform statewide jurisdiction. *See Birchead v. State,* 317 Md. 691, 699, 566 A.2d 488 (1989). A District Court judge's authority to issue a search warrant is not restricted to the county of the judge's residence. *Id.* at

699–700, 566 A.2d 488. Therefore, the search warrant issued in this case was valid throughout Maryland. There was no attempt to give the search warrant "extra-territorial effect."

In the case at hand, the State, *inter alia*, relies on article 27, section 594B(h)(2)(ii), of the Maryland Annotated Code (1957, 1996 Repl.Vol.), which grants federal law enforcement officers "[t]he power to execute arrest and search and seizure warrants issued under the laws of this State," provided

(i) The [federal law enforcement] officer is participating in a joint investigation with officials from any State or local law enforcement agency;

(ii) The officer is rendering assistance to a police officer;

(iii) The officer is acting at the request of a local police officer or a State Police officer; or

(iv) An emergency exists.

The State contends that because federal marshals were present, the search, by Baltimore City police officers in Baltimore County, was valid. Appellant counters that once the Baltimore City officers left the City, "they no longer had police powers and, thus, the federal marshals could not have been assisting a police officer...."

The logic of appellant's argument is elusive. The statute in question unmistakably includes all Baltimore City police officers within the ambit of the definition of the term "police officer." *See* Md.Code Ann. art. 27, § 594B(g)(2) (1957, 1996 Repl.Vol.). The marshals therefore were "rendering assistance to a police officer." We, therefore, agree with the motions judge, who ruled that the presence of the federal marshals in Baltimore County when the Baltimore City police officers executed the valid search warrant made the search and seizure lawful.

In any event, even assuming, *arguendo*, that the provisions of article 27, section 594B, were not complied with, the sanction for noncompliance would not be suppression of the evidence. This was made clear in *Miller v. State*, 151 Md.App. 235, 824 A.2d 1017 (2003). At issue in *Miller* was the

validity of an arrest in Baltimore City by Baltimore County police officers. *Id.* at 242–43, 824 A.2d 1017. After appellant's arrest, photographs of him were taken, and DNA evidence was obtained. *Id.* at 242–43, 824 A.2d 1017. When evidence seized as a result of his arrest was later proffered in a subsequent prosecution, appellant moved to suppress on the ground that the "arrest was illegal and any fruits of that illegal arrest should have been suppressed as 'fruit of the poisonous tree' under *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)." *Id.* at 243–44, 824 A.2d 1017. More specifically, appellant contended that the County police officers had no legal authority to arrest him in Baltimore City. We rejected that contention for several reasons. In doing so, we construed section 2–102 of the Maryland Criminal Procedure Article of the Maryland Code (2001), which is the successor to article 27, section 594B. *Id.* at 246–47, 824 A.2d 1017. We said in *Miller,*

> But even if the officers did not have authority under § 2–102 of the Maryland Criminal Procedure Article to arrest appellant, the court had no legal basis upon which to suppress the evidence obtained from that arrest. *Maryland does not have an independent exclusionary rule, Howell v. State,* 60 Md.App. 463, 466, 483 A.2d 780 (1984), nor does § 2–102 create one.

> That section does not require the suppression of any evidence obtained in violation of it. And we cannot supply what the legislature has omitted, without, in the words of Justice Felix Frankfurter, "adding a colonial wing to a gothic cathedral." *Interstate Commerce Comm'n v. J–T Transp. Co.,* 368 U.S. 81, 115, 82 S.Ct. 204, 7 L.Ed.2d 147 (1961)(dissenting opinion). Indeed, 2–102 was intended not to control or limit police activity, but to enhance and expand it. Its purpose, as stated in the legislative summary of its senate progenitor, was to "foster greater efficiency and cooperation among law enforcement officers in fighting crime on a multi-jurisdictional level." *Limited Extrajurisdictional Authority for Police Officers,* 1993 Leg. (Md.1993) (summary of S.B. 344). We therefore conclude that § 2–102

does not require, by either its terms or its history, the suppression of evidence as a sanction for the failure to comply with its provision.

*Id.* at 246–47, 824 A.2d 1017 (emphasis added).

Therefore, even if we assume, *arguendo,* that the federal officers were not aiding "police officers" within the meaning of article 27, section 594B, the sanction would not be the suppression of the evidence seized, as appellant contends.

## ISSUE 4: WAS APPELLANT'S TESTIMONY AT THE FIRST TRIAL COMPELLED?

At trial, appellant asserted that the State should not have been allowed to show the videotape of, or in any way refer to, the testimony he gave in the first case because his prior testimony was "compelled." According to appellant, the evidence was compelled because it was only given in response to his wife's improperly admitted testimony. In making this argument, appellant asks us to make the assumption that he would not have testified in the first case unless the court had not erroneously allowed his wife to testify as to confidential communications. The record plainly contradicts the assumption.

As made clear in the Court of Appeals opinion in the subject case, the objected-to testimony by appellant's wife came as a surprise to everyone. *See Brown,* 359 Md. at 185, 753 A.2d 84. In opening statement, which was prior to the discovery that appellant's wife was going to testify about a confidential communication, counsel for appellant promised the jury that appellant would testify. In the first trial, appellant's counsel recalled that earlier promise in her closing argument:

> Keith Brown, you know, *because we promised you, unlike every other trial-we promised you in the beginning that you [the jury] would hear from him.*

(Emphasis added.)

Thus, it is clear that appellant did not take the stand and testify simply because he wanted to rebut his wife's allegation

that he had confessed to her that he had committed the crime. *See Henze v. State,* 154 Md. 332, 347, 140 A. 218 (1928)(The admissibility of evidence given in a former trial depends on whether the testimony was given voluntarily; where there is no evidence to the contrary, it will be presumed that the evidence so given was voluntary.). Plainly, appellant did not rebut the presumption that he testified in the first trial voluntarily.

But, even if we assume, *arguendo,* that the reason appellant took the stand in the first trial was so that he could rebut the testimony introduced in violation of the marital privilege, we hold that the trial court did not err in allowing the jury to consider appellant's prior testimony.

Appellant relies on *Harrison v. United States,* 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968). In *Harrison,* the testimony which tainted the first trial was the illegal acquisition of three confessions. The *Harrison* Court carved out a narrow exception to the usual rule that a defendant who chooses to testify waives his privilege against compulsory self-incrimination with respect to the testimony he gives. *Id.* at 222, 88 S.Ct. 2008. The *Harrison* Court said,

> The question is not *whether* the petitioner made a knowing decision to testify, but *why.* If he did so in order to overcome the impact of confessions illegally obtained and hence improperly introduced, then his testimony was tainted by the same illegality that rendered the confessions themselves inadmissible.... [T]he Government must show that its illegal action did not induce his testimony.

*Id.* at 223–25, 88 S.Ct. 2008.

Appellant extracts from the language used in the *Harrison* decision the principle that, if the question is "why" appellant testifies, the test becomes: If the defendant is facing inadmissible evidence that prejudices his defense and makes the defendant feel "compelled" to respond, "it does not matter whether the prejudicial evidence was inadmissible because it violated a constitutional provision, a statute, a case, or a court rule." We disagree.

In *Michigan v. Armentero*, 148 Mich.App. 120, 384 N.W.2d 98 (1986), the defendant was charged with murder. *Id.* at 100. At his first trial, testimony by the defendant's spouse was introduced, which violated the defendant's statutory marital privilege. *Id.* Defendant's trial counsel, however, waived the objection to the inadmissible evidence by failing to object to it at a preliminary hearing. *Id.* The defendant was subsequently awarded a new trial based on his counsel's failure to object.

At a second trial, the prosecutor sought to introduce defendant's testimony from the first trial; defense counsel objected based on *Harrison. Id.* The defendant's testimony from the first trial was admitted, after deletion of defendant's response to the testimony of his wife. *Id.*

The Michigan Court of Appeals rejected the defendant's contention that the rule in *Harrison* precluded the admission of his testimony in the first trial. The court said,

> The key to applying *Harrison* to situations beyond the illegal confessions evidence category lies in defining what the Court meant by "illegal" evidence which impelled the defendant's testimony. The wrongful confession evidence which impelled the defendant's first trial testimony in *Harrison* was constitutionally illegal under the Fifth Amendment. This type of "illegal" evidence is barred for two general reasons. First, it is **barred in order to preserve the basic human dignity** value found in the constitutional prohibition against compelled self-incrimination. Second, such evidence is barred in order to assure the reliability of evidence upon which a criminal conviction is based. Wrongfully obtained confessions have not proved to be reliable evidence. Thus, such evidence infringes upon a defendant's right to a fair trial and is considered "illegal."

> The application of the *Harrison* exception to the general rule of allowing into evidence a defendant's prior testimony depends upon the existence of evidence which is illegal in one of the two ways described above. The evidence impelling the defendant's prior testimony must infringe upon a

basic constitutional value (such as the Fifth Amendment right to be free from being compelled to incriminate oneself), or it must threaten the credibility of the verdict, because of the unreliability of the evidence (such as an unlawfully obtained confession), thus infringing upon the defendant's constitutional right to a fair trial.

By defining "illegal" evidence in this way, the application of the *Harrison* exception is not restricted to situations where police misconduct has produced the evidence that impels defendant's prior testimony. Such a narrow limitation of *Harrison* to the traditional "fruits of the poisonous tree" doctrine is not warranted and is unnecessary for a decision in this case. Harrison *is only limited to situations where the evidence impelling a defendant's prior testimony is illegal in the sense that it infringes upon basic constitutional values or, to put it another way, upon a defendant's right to a fair trial.* Only when evidence is "illegal" in this sense is a defendant's Fifth Amendment right to remain silent infringed upon when he is impelled to testify in response to the admission of the evidence. Evidence which impels a defendant to testify, *even though technically inadmissible due to general policies of state statutory or common law, is "legal" evidence for the* Harrison *exception if it does not infringe upon basic constitutional values or present a situation where the result is likely to rest upon inherently unreliable evidence.*

The evidence that impelled the within defendant to testify was "legal" evidence for purposes of applying *Harison* [sic]. The testimony of defendant's wife at the first trial was inadmissible on two grounds. First, the admission of this evidence violated defendant's statutory spousal privilege. Second, the failure of defendant's counsel to assert the spousal privilege constituted ineffective assistance of counsel under this state's two-prong test set forth in *People v. Garcia* [, 398 Mich. 250, 247 N.W.2d 547 (Mich.1976) ]. Neither of these flaws render the testimony of defendant's wife "illegal" evidence for purposes of the *Harrison* exception.

*Armentero,* 384 N.W.2d at 101–02 (emphasis added)(footnotes omitted).

We agree with the *Armentero* court that the *Harrison* decision is applicable only "to situations where the evidence impelling the defendant's prior testimony is illegal in the sense that it infringes upon basic constitutional values or, to put it another way, upon the defendant's right to a fair trial." *Id.* at 101–02. Here, as in *Armentero,* although appellant's wife's testimony was "technically inadmissible," its inadmissibility was due to "general policies of state statutory . . . law." *Id.* at 102. The objected-to evidence admitted at appellant's first trial infringed upon no basic constitutional right as demonstrated by the fact that the Supreme Court has held that under federal law such testimony *is* admissible. *See Trammel v. United States,* 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980); *see also, Mazurek v. District Court of 20th Judicial District,* 302 Mont. 39, 22 P.3d 166, 167 (2000).

We therefore hold that the trial judge did not err in rejecting appellant's contention that his testimony in the first trial was inadmissible because it was "compelled."

## ISSUE 5: WAS APPELLANT'S SENTENCE ILLEGALLY INCREASED?

■ Section 12–702(b) of the Courts and Judicial Proceedings Article of the Maryland Code (1998 Repl.Vol.) provides:

*Remand for sentence of new trial; limitations on increases in sentences.*—If an appellate court remands a criminal case to a lower court in order that the lower court may pronounce the proper judgment or sentence, or conduct a new trial, and if there is a conviction following this new trial, the lower court may impose any sentence authorized by law to be imposed as punishment for the offense. However, it may not impose a sentence more severe than the sentence previously imposed for the offense unless:

(1) The reasons for the increased sentence affirmatively appear;

(2) The reasons are based upon additional objective information concerning identifiable conduct on the part of the defendant; and

(3) The factual data upon which the increased sentence is based appears as a part of the record.

Appellant was originally sentenced to life without the possibility of parole for his conviction of first degree murder, plus five years without parole for his conviction for use of a handgun, with the five-year sentence to run *concurrently* with the life sentence.

After the second trial, appellant was sentenced to thirty years for the second degree murder conviction and five years *consecutive*, without the possibility of parole, for the use of a handgun conviction.

Appellant contends that running the sentence for the handgun charge consecutive to the second degree murder sentence constituted an illegal enhancement of sentence. We agree. The case of *Wilson v. State*, 45 Md.App. 675, 415 A.2d 605 (1980), is controlling.

Kenneth Wilson was convicted of rape and robbery; he was initially sentenced to life in prison for the rape and ten years concurrent for the robbery. *Id.* at 675, 415 A.2d 605. In a separate case, he was sentenced to ten years for perverted sex acts, and two years for carnal knowledge. *Id.* These later sentences were to run consecutively to each other but concurrent to the sentence for the rape. *Id.* at 676, 415 A.2d 605. *Wilson* filed a motion for reduction of sentences and the trial judge reduced his sentence on the rape charge to twenty-one years; he also modified the robbery sentence as well as the sentences for the sex offenses by making them run *consecutively* to the twenty-one-year sentence for the rape conviction. *Id.* In sum, initially Wilson's cumulative sentence was life imprisonment, plus another twenty-two years (for the robbery and two additional sex crimes) to run concurrently. After sentence modification, his sentence was twenty-one years for the rape conviction, plus twenty-two years *consecutively* for the robbery and the two sex offenses. Wilson filed a petition

for post-conviction relief in which he complained that the court had illegally modified the sentence for robbery, perverted sex acts, and carnal knowledge. *Id.* The trial court denied Wilson any relief, after stressing that "the modification of the Petitioner's sentence did produce an overall reduction of time to be served...." *Id.*

In *Wilson,* Judge Couch, for this Court, said,

We believe the trial judge erred in denying relief and shall therefore grant this application for leave to appeal. In *State v. White,* 41 Md.App. 514, 397 A.2d 299 (1979), we specifically held "to change a sentence from a concurrent one to a consecutive one is a modification upward." Furthermore, Maryland Rule 774(b) [now Maryland Rule 4–345(b)] clearly precludes the court from increasing the length of any sentence. *See also Smith v. State,* 31 Md. App. 310, 356 A.2d 320 (1976). In the instant case the hearing judge concluded that *White* was distinguishable because, there, three different sentences were given by three different judges on three different occasions for three different crimes, whereas petitioner was sentenced by one judge on a single occasion. In our view this is exalting form over substance; it would seem to make little difference to a defendant whether he was being sentenced by three judges for three different crimes rather than a single judge on a single occasion. If a sentence is illegal, it is illegal and cannot be allowed to stand. The hearing judge also found that the totality of the sentences had to be looked at and, in doing so, if there was a reduction of the total, then there was no impropriety. We disagree. We believe each sentence must be viewed singly and if it is illegal, it cannot stand. Maryland Rule 774(b), by its terms, when referring to a sentence, consistently does so in the singular and makes no reference to multiple sentences. In our view the hearing judge had no authority to lump all the sentences together and treat them as a single sentence. Furthermore, we note that by now Wilson has served nearly five years of his concurrent robbery term, but if his modified sentence is allowed to stand he will be subject to serving his

robbery sentence only after he has served his rape conviction, obviously a charge to his detriment. Changing the ten year robbery sentence to consecutive from concurrent was a violation of Maryland Rule 774(b).

*Id.* at 676–77, 415 A.2d 605.

On remand, the circuit court should modify the sentence for Count II, so that the five-year sentence for the handgun offense will run concurrent to the sentence imposed in Count I, the second degree murder count.

SENTENCE AS TO COUNT II VACATED; CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR A MODIFICATION OF SENTENCE AS TO COUNT II; JUDGMENTS OTHERWISE AFFIRMED; COSTS TO BE PAID EIGHTY PERCENT BY APPELLANT AND TWENTY PERCENT BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.